FORBES & WALLACE, INC. *vs*. CITY OF SPRINGFIELD & another.[1]

Suffolk. October 16, 1985. — December 20, 1985.

Present: ARMSTRONG, CUTTER, & WARNER, JJ.

*Taxation*, Real estate tax: collection. *Redevelopment Authority. Estoppel. Eminent Domain*, What constitutes taking.

In an action by the city of Springfield to recover a real estate tax for fiscal year 1975 against a corporation which owned the property in question at the time the tax was assessed, the judge was warranted in concluding that the corporation was not relieved of its obligation to pay the tax as a result of a series of transactions ending with acquisition of the property by the Springfield Redevelopment Authority under a deed expressly subject to all real estate taxes on the property, where the earlier conveyance of the property by the corporation was not subject to real estate taxes, where the city and the authority were separate entities, and where there was no showing that the city was barred from collecting the 1975 tax from the corporation by any ground of unjust enrichment. [272-275]

In an action by the city of Springfield to recover a real estate tax for fiscal year 1975 against the corporation which owned the property in question at the time the tax was assessed, the record did not support the corporation's contention that the city was estopped from collecting the tax by conduct of its mayor with respect to a series of transactions ending with the acquisition of the property by the Springfield Redevelopment Authority. [275-276]

In an action by the city of Springfield to collect an unpaid real estate tax from the corporation which owned the property in question at the time the tax was assessed, the judge was warranted in finding that a subsequent acquisition of the property by the Springfield Redevelopment Authority under a deed preceding by six months an order of taking was not a taking by eminent domain, either actual or constructive, and that, consequently, a notice by the city's tax collector under G. L. c. 79, § 44A, with respect to the acquisition of the property by the authority did not bar the city from collecting the unpaid tax from the corporation. [276]

[1] The collector of taxes of Springfield was joined as a defendant in the original complaint, and was one party bringing the counterclaim. J.M.B. Income Properties LTD., 1973 (an Illinois limited partnership, hereafter J.M.B.) was impleaded by the city as a third party.

CIVIL ACTION commenced in the Superior Court on July 22, 1977.

A motion for summary judgment was heard by *Andrew Gill Meyer*, J., and the case was heard by *George C. Keady, Jr.*, J.

*John J. Rosenberg* for the plaintiff.

*Harry P. Carroll*, Deputy City Solicitor (*Richard T. Egan*, City Solicitor, with him) for the city of Springfield & another.

*Laura Steinberg*, for J.M.B. Income Properties LTD., 1973, submitted a brief.

CUTTER, J. This case now relates only to real estate taxes for the fiscal year 1975, assessed with respect to downtown commercial property (the locus) in Springfield (the city). The locus formerly was occupied by a department store operated by Forbes & Wallace, Inc. (Forbes) which owned the equity in it on January 1, 1974. Because of settlements,[2] the issues remaining arise from the city's counterclaim against Forbes to recover the unpaid 1975 taxes assessed with respect to the locus. The facts still pertinent are stated largely on the basis of the thorough amended findings and decision of a Superior Court judge who heard the controversy without a jury.

Demand upon Forbes for payment of the 1975 taxes was made by the city's collector of taxes. No monetary payment of the 1975 taxes has been made. On August 3, 1977, a taking for nonpayment of the 1975 taxes was recorded in the registry of deeds. In 1974, Travelers Insurance Company (Travelers), the holder of the mortgage of the locus to secure a loan of $2,800,000, decided to collect that indebtedness. To obtain new financing, Forbes sold the locus to J.M.B. for $4,800,000,[3]

[2] Taxes for 1975 upon the so-called "Waters" lot, adjacent to the locus, no longer are involved in the controversy, because these have been paid as a result of transactions mentioned below, n. 4. Taxes upon the locus for the years 1976 to 1979 were settled by J.M.B.'s payment made to the city in May, 1984. J.M.B.'s claim against Forbes, for reimbursement of this settlement payment to the city, has now been settled. Forbes's appeal from a judgment obtained by J.M.B. against it for such reimbursement in this proceeding was dismissed after the arguments in accordance with the written agreement of the parties, without prejudice to Forbes's right to continue its appeal with respect to issues involving the city.

[3] The purchase price paid to Forbes included $2,000,000 in cash, and a mortgage from J.M.B. of the locus to secure indebtedness of $2,800,000,

and leased it back under a net lease which, among other things, required Forbes to pay all real estate taxes. J.M.B. gave to Chase Manhattan Bank (Chase) a mortgage of the locus to secure a note of Forbes for $2,800,000 given for advances by Chase to pay off Forbes's indebtedness to Travelers.

On July 22, 1977, Forbes filed this complaint to enjoin the city's tax collector from taking the locus for nonpayment of taxes. The city filed a counterclaim seeking in Count I recovery (under G. L. c. 60, § 35) of the unpaid 1975 taxes.[4] A preliminary injunction was denied on August 3, 1977. Summary judgment was granted to the city under Forbes's original complaint, but the city's counterclaim remained alive. Trial beginning on June 4, 1984, proceeded before a Superior Court judge on the city's counterclaim.

At trial it appeared that between 1974 and 1978, Forbes had closed the store on the locus. A default on the new mortgage of the locus caused Chase to foreclose it. At the foreclosure sale, Chase was the successful bidder at $910,000, on the indebtedness of $2,800,000. After the sale, Chase recovered from Forbes in New York a deficiency judgment of $2,100,000, which has been satisfied.

In 1979, a corporation, Commercial Investment Group, Inc. (C.I.G.), was formed to acquire and renovate the building on the locus. It bought the locus from Chase on December 5, 1979,

---

as part of complex refinancing transactions. The 1971 mortgage of the locus to Travelers is not reproduced in the record appendices. The complicated refinancing in 1974 was designed obviously in part to replace that mortgage which, if it contained usual provisions (see G. L. c. 183, § 20), would have imposed on Forbes the obligation to pay real estate taxes on the locus.

[4] On September 7, 1979, the city under G. L. c. 60, § 65, commenced proceedings in the Land Court to foreclose all rights of redemption under its earlier tax taking. As a part of negotiations for release of the adjacent Waters lot from the tax controversies for separate redevelopment, the then mayor of Springfield, Mr. Theodore E. Dimauro, in 1980 agreed "to delay prosecution of" this proceeding and the Land Court proceeding "for a limited time that had no definite term, but he [the mayor] always intended," so the trial judge found, "to collect the back taxes owed to the [c]ity . . . attributable to [the] locus." The trial judge concluded that the mayor "did not agree . . . to terminate this . . . suit or to . . . abandon its prosecution" and that he did not have authority to do so.

for $1,000,000, subject to real estate taxes, which then amounted to about $1,000,000. Mayor Dimauro persuaded Massachusetts Mutual Life Insurance Company (Mutual) to lend C.I.G. $900,000, secured by a first mortgage on the locus. The mayor had assured Mutual that, "in the event of a C.I.G. default," the city and its "appropriate . . . officials would make every effort to obtain another developer so that . . . Mutual would not suffer financially." This assurance, the trial judge found, "did not constitute an agreement . . . of the [c]ity," for the mayor "had no power to make such an agreement" and the city had no authority to·carry out such an agreement. The city's director of community development signed a letter of December 5, 1979, stating that, if the city should "decide to acquire" the locus, the purchase price would be "constructed" in such a way as to amount to $1,274,800. This letter, the judge found, "was not an agreement but merely a statement of what the [c]ity would attempt to do."

By July, 1980, C.I.G. discovered that it could not obtain financing to carry through renovation of the locus. After discussions, the city and the Springfield Redevelopment Authority (SRA) began efforts to obtain from the Federal government an urban development action grant (U.D.A.G.). SRA was a body politic and corporate existing under G. L. c. 121B. It had cooperated with various officers of the city's government and other public or semi-public officers and organizations in attempting the redevelopment of downtown Springfield.

SRA passed, on October 22, 1981, a resolution which approved a purchase of the locus from C.I.G. for $1,850,000, later changed in June, 1982, to a price of $1,775,000.[5] A few days before September 16, 1982, the city received a U.D.A.G. grant of $1,775,000 and turned it over to SRA. By a deed, dated September 16, 1982, but not recorded until October 12, 1982, C.I.G. conveyed the locus to SRA for $1,775,000. This

---

[5] SRA passed votes on July 28, 1982, and on August 26, 1982, authorizing SRA to take the locus by eminent domain for $1,775,000. The city's collector of taxes made demand upon SRA on August 13, 1982, under G. L. c. 79, § 44A, for payment of the taxes for 1976 through 1978, but no such demand was made for 1975 taxes. See part 5 of this opinion, *infra*.

deed was expressly "[s]ubject to . . . all real estate taxes, penalties and interest assessed" with respect to the locus by the city, "which the grantee [SRA] herein assumes and agrees to pay."[6] Later, on March 8, 1983, SRA made an order of taking of the locus from a "[s]upposed owner," C.I.G., for an award stated as $1. C.I.G. has not been shown to have filed suit against SRA for an assessment of damages for this taking.[7] On May 4, 1984, very shortly prior to the planned trial of this case, Forbes moved to implead SRA as a third-party defendant. This motion, with trial very close, reasonably was denied.

After reviewing the facts outlined above, the trial judge ordered judgment for the city against Forbes for the 1975 taxes, penalties, and interest (a total of $401,164.76 as of August 23, 1984). He also ordered judgment for J.M.B. against Forbes (a matter which has since been settled, as stated in note 2, *supra*). Forbes has appealed.

1. The remedies provided for the collection of a real estate tax are cumulative. No one such remedy is exclusive, and more than one may be pursued concurrently. *Boston* v. *Turner*, 201 Mass. 190, 196-197 (1909). *Boston* v. *Gordon*, 342 Mass. 586, 591 (1961). See Nichols, Taxation in Massachusetts 357-360, 381-383 (3d ed. 1938, and Pike & Cohen, Supp. 1962, 61-64). The trial judge correctly concluded that Forbes had not shown that the city had "received a monetary payment for any of the [1975] taxes" with respect to the locus. The direct liability of Forbes for those taxes thus entitled the city and its tax collector to judgment on the counterclaim in the absence of proof by Forbes of facts underlying some legal barrier to col-

---

[6] The proceeds of the purchase were applied by C.I.G. as follows: $1,061,827 to Mutual for the discharge of C.I.G.'s mortgage of the locus to Mutual, and the balance to C.I.G. for various expenses incurred by it in its urban renewal efforts. Prior to the closing, SRA had access to the U.D.A.G. grants.

[7] There was testimony that SRA's votes authorizing takings were valid only for thirty days. No such resolution is shown by this record to have been passed within thirty days prior to the later (taken on September 27, 1982) of two acknowledgments on C.I.G.'s deed to SRA. The deed was not delivered until after that date.

lection. We discuss Forbes's contentions that some obstacles to collection exist.

2. Forbes places great reliance on *Webber Lumber Co.* v. *Shaw*, 189 Mass. 366 (1905).[8] The trial judge correctly recognized (when denying on June 1, 1984, Forbes's pretrial motion to join SRA as a defendant) that Forbes did not sell the locus to J.M.B. expressly subject to outstanding taxes.[9] On the contrary, Forbes sold the locus to J.M.B. for $4,800,000 (including a mortgage to be granted by J.M.B. to supplant the existing mortgage to Travelers, see note 3, *supra*), which the judge noted "was probably the [1974] fair market value" of the locus. There was not shown any basis under the *Webber* case for treating Forbes as entitled now to be subrogated to the city's lien for the 1975 taxes, not only because Forbes has not paid those taxes, but also because its sale of the locus was not made subject to them.[10]

The locus has never been owned by the city except by placing the locus on its tax title account. It has not been proved that

---

[8] In that case Webber Lumber Company (Webber) had owned land when the 1904 real estate tax with respect to it had been assessed. Webber was stated by the Supreme Judicial Court to have been "primarily liable for the tax". The land was sold at a foreclosure sale "subject to the tax" with the consequence "that the price paid at . . . [that] sale was not the value of the land, but [at most] the value less the tax". See the *Webber* case, at 367. A bill in equity by Webber to enjoin the tax collector from collecting the tax by suit was dismissed. The court, however, recognized (at 367) that to compel Webber to pay the tax would have the effect of compelling Webber "to pay twice, once when the property was sold, and once to the collector." Accordingly, it was held (at 367-368) that Webber, upon payment of the tax, "should be subrogated to the claim of the [tax] collector" against the land upon the tax lien enforceable by the collector.

[9] A resolution of Forbes's directors on May 23, 1974, provided that Forbes, under the sale and net lease-back of the locus, would pay all taxes. Also viewing the 1974 transaction as a whole, there was at least an implied obligation on Forbes to discharge the lien of any unpaid taxes for which Forbes was primarily liable to the city and which (see note 3, *supra*) it probably already was bound to pay under its earlier mortgage to Travelers.

[10] Whatever may have been the cause of the foreclosure in the *Webber* case, in the present instance the default by Forbes and foreclosure by Chase, subsequent to the 1974 refinancing of Forbes, so far as this record shows, may have been caused by Forbes's inability after 1974 to operate its store on the locus without great loss.

as yet the tax title on the locus has been foreclosed. Thus the city has not been in a position to apply to Forbes's "liability [for 1975 taxes] the security afforded by the tax title." See *Boston* v. *Gordon*, 342 Mass. at 592. Title to the locus is now in SRA, not the city. Whether SRA is a separate entity from the city is discussed in part 3 of this opinion.

3. Forbes argues that the city will be unjustly enriched if its tax collector is allowed to recover the 1975 taxes from Forbes. This contention seems to be based upon (a) the Chase foreclosure of its mortgage upon the locus for $910,000 and the subsequent payment by Forbes of $2,100,000 on the deficiency judgment recovered by Chase, and (b) the later acquisition of the locus by SRA from C.I.G. for $1,775,000, subject to taxes, which SRA agreed to assume and pay. SRA thus far has not paid the taxes. Forbes now takes the position that the taxes in some manner in effect have been paid through the transactions already described and that the city has realized an undeserved gain.

Forbes, in an effort to maintain this contention, treats the city and SRA as essentially the same. They, however, are separate entities. See the pertinent provisions of G. L. c. 121B, inserted by St. 1969, c. 751, § 1. To be sure, various provisions of c. 121B, e.g., §§ 19 and 20, contemplate that a city, by proper action pursuant to any necessary authority given by its legislative body, may participate extensively in the work of a redevelopment agency within its borders. See e.g., *Lynn Redevelopment Authy.* v. *Lynn*, 360 Mass. 503, 505-506 (1971). No statutory provision, however, appears to treat the two entities as one and the same. See discussion in *Kargman* v. *Boston Water & Sewer Commn.*, 18 Mass. App. Ct. 51, 54-58 (1984). See also *Johnson-Foster Co.* v. *D'Amore Constr. Co.*, 314 Mass. 416, 419 (1943); G. L. c. 121B, §§ 19-20, which require an appropriation by a city or town as the basis for the expenditure of city tax money in aid of a redevelopment agency. See Randall & Franklin, Municipal Law and Practice § 1261 et seq. (1982 & Supp. 1985). Although the city participated actively in applying for the U.D.A.G. grant and in making it available to SRA, it was SRA which took title to the locus,

subject to outstanding taxes, which SRA agreed to pay. As SRA is not a party to this proceeding, we do not determine now (a) what its obligations are with respect to the payment of the 1975 taxes, or (b) whether the judge correctly concluded that the evidence before him did not show "that Forbes was an intended beneficiary of" SRA's promise to pay outstanding taxes.[11] For the purposes of the present case, we hold only that Forbes has not established that SRA's acquisition of the locus (and its promise to assume outstanding taxes) now bars the city and its tax collector, on any ground of unjust enrichment, from collecting the 1975 taxes from Forbes.

4. Forbes claims that the city is estopped by the conduct of former Mayor Dimauro to press against Forbes it counterclaim to collect the 1975 taxes. Because estoppel is an affirmative defense, the burden of establishing it (under the counterclaim) rests upon Forbes. See *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 161-164 (1977), a case which reviews extensively the decisions that "a municipality cannot ordinarily be estopped by the acts of the officers" (at 162) in derogation of enforcement of public rights (there zoning provisions). See also *Corea* v. *Assessors of Bedford*, 384 Mass. 809 (1984), and cases cited. Here the trial judge concluded on ambiguous and somewhat conflicting evidence, largely oral, that the actions of the mayor (relied on by Forbes) "did not rise to the level of firm agreement on which one might justifiably rely." As to assurances attributed to the mayor about intended delay in collecting taxes, or of his intention that they be collected only from a developer, these were in effect found (if made) to have been made without authority. They certainly appear to have been made without complying with statutory

---

[11] The judge's determinations that "the [c]ity never acquired title to the locus" and that SRA "is a separate entity" from the city necessarily amount to the conclusion (on conflicting evidence) that SRA did not act so as to make it the city's agent in acquiring the locus (as Forbes now contends). In any event, application of the *Webber* case (note 8, *supra*) is not appropriate in this situation where Forbes did not sell the locus subject to the 1975 taxes and where it has not been shown to have received from J.M.B. less than the 1974 fair market value for the locus.

procedures protecting the tax collector. See e.g., G. L. c. 58, § 8. See also *Lawrence Print Works* v. *Lynch*, 52 F. Supp. 615, 616-617 (D. Mass. 1943), affd., 146 F.2d. 996 (1st Cir. 1945); Nichols, Taxation in Massachusetts, *supra*, at 364-366; 16 McQuillin, Municipal Corporations § 44.129 (3d ed. rev. 1984).

5. Forbes argues that SRA's acquisition of the locus constituted an eminent domain taking, and a proper demand for outstanding taxes pursuant to G. L. c. 79, § 44A, precludes the city from now recovering taxes from Forbes. The judge justifiably concluded on the evidence that no eminent domain taking of the locus was made by SRA in March, 1983, and that the deed to SRA recorded on October 12, 1982, was neither an actual nor a constructive taking. See and compare *Cayon* v. *Chicopee*, 360 Mass. 606, 608-612 (1971). Compare also *Hub Theatres, Inc.* v. *Massachusetts Port Authy.*, 370 Mass. 153, 154, 156-157 (1976). The deed, dated September 16, 1982, from C.I.G. to SRA "preceded by six months" SRA's purported eminent domain taking. The trial judge could find that, as SRA already owned the locus, the taking of March 8, 1983, "was of no effect," where title had been acquired by what the judge reasonably found to be the result of negotiation. As there was no eminent domain taking, the notice given by the city's tax collector (which in any event made no reference to 1975 taxes) was not authorized by G. L. c. 79, § 44A, which applies only where there has been an "eminent domain" taking.

The judgment for the city and its tax collector on their counterclaim for the unpaid 1975 taxes with respect to the locus, with any interest and penalties, is affirmed, without prejudice to the reasonable assertion by Forbes of any claims against SRA, by subrogation or otherwise, for such amounts. The judgment dismissing Forbes's original claim is affirmed.

*So ordered.*